UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                        :    Chapter 7

JEANNE S. DILORETO                           :

              Debtor                         :    Bankruptcy No. 07-15413bf

.................................................

MEMORANDUM

.................................................

Presently before me is the motion filed by Mrs. Jeanne Diloreto[1] seeking

attorney's fees and costs under 11 U.S.C. § 303(i)(1) as well as damages, including

putative damages under section 303(i)(2), against Eric DiNallo, Superintendent of

Insurance of the State of New York, in his capacity as liquidator of Nassau Insurance Co.[2]

The respondent Liquidator opposes the requested relief.

        An evidentiary hearing on this motion took place over two days, with the

parties agreeing that the issue of punitive damages should be deferred until I had

determined whether the Liquidator filed his involuntary petition in bad faith.[3]

        The instant section 303(i) motion is determined against the following

factual background, much of it undisputed (although the parties disagree as to the

relevance of numerous facts).  I shall detail these facts in narrative format.

_____

        [1]In numerous decisions and pleadings, the putative debtor's name (and that of her
husband) was spelled "Diloreto."  In her post-hearing memorandum, it is spelled "Di Loreto."
For the sake of consistency, I will use the former spelling.

        [2]The parties refer to Mr. DiNallo as the "Liquidator" and so shall I.

        [3]They also concurred that the damage request under section 303(i)(2) did not
implicate any issues under the Eleventh Amendment.

I.

This section 303(i) dispute is but the latest piece of ligation to arise in, arise under, or be related to the efforts of the Liquidator, since 1985, to recover under reinsurance treaties issued in favor of Nassau.  See Curiale v. Ardra Insurance Co., Ltd, 88 N.Y.2d 268, 271 (Ct. App. N.Y. 1996).[4]  The Liquidator asserted in state court litigation that Nassau had improperly diverted funds to Ardra Insurance Company, a Bermudian entity, and that Ardra, in turn, diverted funds to other offshore entities all under the control of Mr. and Mrs. Diloreto.

The 1985 lawsuit eventually went to trial before a jury in New York state court.  In June 2001, Mrs. Diloreto and her husband were found liable to Nassau as the alter egos of Ardra Insurance Co., which company had issued the reinsurance treaties.  After consideration of post-trial motions, judgment was entered against Mrs. Diloreto on April 18, 2002 in the amount of $20,507,456.86.  See Serio v. Ardra Insurance Co., Ltd., 304 A.D.2d 362, (N.Y. App. Div. 1st Dep't 2003), appeal dismissed, 100 N.Y.2d 576 (Ct. App. N.Y. 2003), leave to appeal denied, 100 N.Y.2d 516 (Ct. App. N.Y. 2003).[5]

Shortly after the entry of this judgment, the Liquidator sought to execute by transferring the judgment to Chester County, Pennsylvania, where Mrs. Diloreto owns

---

[4]The 23 years of litigation have given rise to decisions issued by the Third Circuit Court of Appeals, In re Diloreto, 2008 WL 227655 (3d Cir. 2008), the Second Circuit Court of Appeals, see, e.g., Corcoran v. Ardra Insurance Co., 842 F.2d 31 (2d Cir. 1988), the district courts for the Eastern District of Pennsylvania and the Southern District of New York, see, e.g., Serio v. Diloreto, 2002 WL 426165 (S.D.N.Y. 2002); Levin v. Tiber Holding Corp., 1999 WL 171430 (E.D. Pa. 1999), and numerous New York state court decisions.

[5]An even larger monetary judgment was rendered against Richard Diloreto, her husband.

2

real estate.  Ex.1.  He also transferred the judgment to  Lee County in Florida, where Mrs.

Diloreto had purchased property in August 2001.[6]

In November 2005, Mrs. Diloreto commenced a malpractice suit in the

Philadelphia County trial court against Pepper Hamilton ("Pepper"), the law firm that had

unsuccessfully represented her in the New York state court case.  Ex. 3.  While that

malpractice suit was pending, on March 16, 2007, the Liquidator served Pepper "as

garnishee" with a writ of execution issued by the Chester County court.  Ex. 1, docket

entry 3/14/07; ex. 2.  The Liquidator also sought to depose Mrs. Diloreto in connection

with his execution efforts, but such deposition did not occur.  Ex. PC-5.

In March 2007, Mrs. Diloreto's malpractice attorney met with counsel for

the Liquidator in an effort to resolve the latter's execution efforts against his client.  Mrs.

Diloreto offered to tender future malpractice litigation proceeds to the Liquidator in

return for satisfaction of the New York state court judgment.  This offer was declined.

By September 2007, the Philadelphia trial in Mrs. Diloreto's malpractice

action was imminent, and Mrs. Diloreto and Pepper were attempting to reach a settlement

of that lawsuit.  Pepper, however, was fearful of paying any settlement funds to Mrs.

Diloreto while the writ of execution was pending against it.  In September 2007, Pepper

filed an emergency state court petition to set aside the writ of execution.  Ex. 4.  A

hearing on that petition was scheduled for September 18, 2007.

---

[6]Mrs. Diloreto owns real estate in Fort Myers, Florida as well as in Malvern
Pennsylvania.   Apparently, Mrs. Diloreto obtained title to this Florida real property shortly after
the jury verdict against her.  The evidence suggests that the New York state judgment was
transferred to Lee County in July 2002.  In July 2007, the Liquidator challenged her assertion of a
Florida homestead exemption as part of his efforts to execute upon his judgment.  See generally
Exs. 12-13 (Motion to Dismiss and Answer, ¶¶ 8-9).

Although the Liquidator had earlier considered filing an involuntary petition against Mrs. Diloreto, he did not do so until September 17, 2007. On that date the Liquidator, as the sole petitioning creditor, filed an involuntary chapter 7 bankruptcy petition against Mrs. Diloreto. He then argued in state court on September 18, 2007 that Pepper's petition to vacate his writ of execution was stayed by the bankruptcy filing. Apparently the court agreed, and no ruling was entered regarding the validity of the Liquidator's writ of execution.

Accompanying the involuntary petition in this court was the Liquidator's motion for the appointment of a bankruptcy trustee under section 303(g), which motion was opposed by Mrs. Diloreto and ultimately denied without prejudice after a hearing. Mrs. Diloreto, in turn, filed a motion for me to recuse under 28 U.S.C. § 455(a) and Fed. R. Bankr. P. 5004(a)—based solely upon my having made credibility findings adverse to Mr. Diloreto in an adversary proceeding filed in connection with Mr. Diloreto's earlier chapter 7 case, see In re Diloreto, 2008 WL 227655, at *2 (3d Cir. 2008) ("[T]hough DiLoreto offers benign explanations for these transactions, he does not persuasively contradict the Bankruptcy Court's finding that he 'embarked upon a complex plan over many years to control his personal assets and the assets of various entities, which assets and entities were titled in the name of family members or numerous corporations but subject to his complete control.'" )—which recusal motion was also denied.

In addition to Mrs. Diloreto's motion to recuse, she filed a separate motion to dismiss under section 305(a)(1). Ex. PC-3. This motion, dated September 20, 2007, alleged that Mrs. Diloreto had reached an "agreement in principal to settle" her malpractice lawsuit and was willing to escrow the settlement proceeds with the state court

4

to determine the rights of the parties to those proceeds.  Id., ¶¶ 10-13.  Thus, she

maintained that dismissal was appropriate.  In further support of discretionary dismissal

under section 305(a)(1), this motion alleged that: the dispute over execution upon

malpractice settlement proceeds was a state law issue that could best be determined by the

state court; the settlement funds could be escrowed pending that state court decision; this

involuntary case was merely a two-party dispute between the Liquidator and Mrs.

Diloreto, as the latter was current in payments to certain creditors; and this involuntary

case would jeopardize the malpractice settlement agreement.  Id., ¶ 18.

Among her assertions under section 305(a) that an order for relief on the

involuntary petition was inappropriate as a manifestation of a two-party dispute, Mrs.

Diloreto pled that she "currently has at most seven total creditors (including Petitioning

Creditor)."  Id., ¶ 25.  Four of those creditors were identified as mortgagees, and two were

credit card issuers, with all six obligations purportedly being current.  Id., ¶¶ 25-26.

Before there was any ruling on Mrs. Diloreto's motion under section 305(a),

two other pleadings were filed.  First, on September 25, 2007, Pepper sought relief from

the bankruptcy stay so that its petition to set aside the writ of execution could be

adjudicated in state court.  That stay relief motion was withdrawn without prejudice on

September 28, 2007, when Pepper and Mrs. Diloreto reached a settlement of the state

court litigation, the terms of which were accepted by the Liquidator and involved the

escrowing of certain funds.

Second, on October 9, 2007, Mrs. Diloreto filed another motion to dismiss

the involuntary petition, relying upon Fed. R. Bankr. P. 1011(b) and 7012.  This new

dismissal request asserted that Mrs. Diloreto was ineligible for bankruptcy relief because

she had not received prepetiton credit counseling under 11 U.S.C. § 109(h).  In addition, she argued that this court lacked personal jurisdiction over her because the involuntary petition and summons were served upon her separately, and because the involuntary petition was served upon her by Federal Express, rather than by first class mail as specified by Fed. R. Bankr. P. 1010 and 7004(b).  Third, Mrs. Diloreto sought dismissal because of the Liquidator's alleged failure to comply with the three petitioning creditor requirement of section 303(b).

Separate from this second dismissal motion, but also filed on October 9, 2007, was an alternative motion to transfer venue of this involuntary proceeding to Florida.

On October 17, 2007, I entered an order scheduling a hearing on the transfer of venue motion as well as the second dismissal motion, but excluded from consideration at that time the debtor's allegations regarding section 303(b).  I noted that Rule 1003(b) set out a procedure for determination of section 303(b) compliance in the context of an answer to the involuntary petition, rather than via a motion to dismiss.

On October 31, 2007, Mrs. Diloreto withdrew her abstention/dismissal motion under section 305.

On November 9, 2007, an evidentiary hearing was held on the second dismissal motion, including the venue transfer request.  At the conclusion of that November 9th hearing, both parties agreed to participate in mediation prior to my rendering any ruling on the dismissal request.

The parties jointly requested that one of my judicial colleagues serve as mediator, and that request was honored.  Apparently, two mediation sessions were held,

6

which sought to resolve not simply the disputed involuntary petition against Mrs. Diloreto

but also the various litigation that the Liquidator had pending against Mr. and Mrs.

Diloreto.  Those mediation efforts proved unsuccessful.

On January 8, 2008, I issued a memorandum and order, docketed on

January 11, 2008.  In that decision, I rejected Mrs. Diloreto's contention that she was

ineligible to become an involuntary chapter 7 debtor as the provisions of 11 U.S.C. §

109(h) were inapplicable.  However, I sustained her alternative argument that this court

had not obtained personal jurisdiction because the involuntary petition had been

improperly served under the Federal Rules of Bankruptcy Procedure.  I also concluded

that the motion to transfer venue was moot.  In re Diloreto, 2008 WL 141922 (Bankr.

E.D. Pa. 2008).  (This ruling also made moot Mrs. Diloreto's contentions under section

303(b).)  Thereafter, the Liquidator did not re-serve the involuntary petition.

On January 22, 2008, Mrs. Diloreto filed an expedited motion to "reopen"

her case pursuant to 11 U.S.C. § 350(b) so that she could file a motion seeking damages,

fees and costs under section 303(i).  By order dated January 23, 2008, I denied that

motion without prejudice.  As the involuntary petition had been dismissed, the case had

never been closed within the meaning of section 350(a) and therefore section 350(b)

could not apply.  See, e.g., In re Income Property Builders, Inc., 699 F.2d 963 (9th Cir.

1982) (per curiam).

The next day, January 24, 2008, Mrs. Diloreto filed the instant motion for

fees, costs and damages pursuant to 11 U.S.C. § 303(i).  In this motion, Mrs. Diloreto

alleges that her attorneys expended $95,666.50 worth of services on her behalf between

September 17, 2007, the date the involuntary petition was filed, and January 11, 2008, the

7

date the dismissal order was entered.  She further asserts that $9,251.16 in costs were incurred during that period.  Ex. 25.  In addition, Mrs. Diloreto maintains that her law firm expended $10,850 in legal services to prepare and file the motion to reopen and the section 303(i) motion.

The instant motion acknowledges that Mrs. Diloreto's bankruptcy counsel, Weir & Partners LLP, was awarded $107,564.00 from the settlement proceeds by the state court, but adds that "time records for those services are not included in this request for legal fees."  Motion, ¶ 22 n.6.  At the hearing held on this motion, Mrs. Diloreto's position altered, and those time records were offered in evidence.  Ex. 28.  The actual time spent was valued at $53,782, but the state court awarded a double multiplier.  Id. The services identified to the state court are excluded from the present fee request. Motion, ¶ 22.  However, exhibit 28 identifies $26,411.50 in services that bankruptcy counsel now contends were rendered in connection with the involuntary case, and for which Mrs. Diloreto seeks an award (with double multiplier) to be paid into the settlement escrow.  Diloreto's Proposed Finding, # 214-15.

In addition, Mrs. Diloreto seeks damages, including actual and punitive damages, against the Liquidator, asserting that the involuntary petition was filed in bad faith.  Total relief sought by Mrs. Diloreto under section 303(i) exceeds $200,000, not including punitive damages.

The Liquidator responds to the instant motion by denying that his involuntary petition was filed in bad faith.  He maintains that the petition was appropriate

8

and filed in good faith, albeit not properly served; moreover, he contends that the

circumstances do not warrant any award of attorney's fees, costs or damages.[7]


II.


Before I consider certain additional evidence offered at the hearing,

including evidence regarding bad faith under section 303(i)(2), it is useful to articulate the

criteria for awarding fees, costs and damages under section 303(i).  This statutory

provision states:

> (i) If the court dismisses a petition under this section other
> than on consent of all petitioners and the debtor, and if the
> debtor does not waive the right to judgment under this
> subsection, the court may grant judgment–
>
>> (1) against the petitioners and in favor of the
>> debtor for–
>>
>>> (A) costs; or
>>>
>>> (B) a reasonable attorney's fee; or
>>
>> (2) against any petitioner that filed the petition
>> in bad faith, for–
>>
>>> (A) any damages proximately
>>> caused by such filing; or

---

[7]Mrs. Diloreto contends in her post-hearing memorandum that the Liquidator's failure to object to specific time entries in his answer (the Liquidator argues that all compensation is unwarranted), waives his opposition to challenge their reasonableness.  Thus, she implies that counsel fees must either be awarded in full or denied completely.  I am unpersuaded that the discretionary application of section 303(i), to be discussed later, requires such a result.  Indeed, I note that Mrs. Diloreto does not feel constrained from seeking reimbursement of fees awarded to her counsel by the state court, even though her motion does not mention such relief.

(B) punitive damages.

The use of the word "may" renders any award under section 303(i)

discretionary.  See, e.g., Higgins v. Vortex Fishing Systems, Inc., 379 F.3d 701, 706 (9th

Cir. 2004) ("[T]he statute's use of the word 'may,' rather than the word 'shall,' 'clearly

contemplates that fees and costs will not be awarded in all cases.'") (quoting In re Reid,

854 F.2d 156, 159 (7th Cir. 1988)).[8]  This discretion even applies to the award of

damages when the involuntary petition has been filed in bad faith under section 303(i)(2).

See In re John Richards Homes Bldg. Co., L.L.C., 439 F.3d 248, 261 (6th Cir. 2006)

("Under 11 U.S.C. § 303(i) a bankruptcy court has the discretion to award compensatory

damages for the injuries proximately caused by the bad faith filing of an involuntary

bankruptcy petition."); see also Shinko v. Miele, 29 Fed. Appx. 890, 891 (3d Cir. 2002)

(non-precedential).  Conversely, absent a demonstration of bad faith, a bankruptcy court

has no discretion to award damages under section 303(i)(2).  See, e.g., In re Bayshore

Wire Products Corp., 209 F.3d 100, 105 (2d Cir. 2000); 2 Collier on Bankruptcy, ¶

303.15[1] at 303-113 (15th ed. rev. 2008).

In In re Bayshore Wire Products Corp., 209 F.3d at 105-06, the Second

Circuit Court of Appeals noted differing analyses used in determining whether "bad faith"

had occurred within the meaning of section 303(i)(2), first holding that there is a

rebuttable presumption that an involuntary petition is filed in good faith:[9]

_____

[8]The language of section 303(i) can be contrasted with other fee-shifting statutes
that use the word "shall."  See, e.g., 29 U.S.C. § 2617(a)(3); 15 U.S.C. § 15(a); 18 U.S.C. §
1964(c); 42 U.S.C. § 9627.

[9]See also In re John Richards Homes Bldg. Co., L.L.C., 439 F.3d at 254; In re
Landmark Distributors, Inc., 189 B.R. 290, 309 n.18 (Bankr. D.N.J. 1995).

10

"Because 'bad faith' is not defined in the bankruptcy code, and because there is no legislative history addressing the intended meaning of this language, courts have used different approaches to determine whether a petition was filed in bad faith [for purposes of § 303(i)(2) ]." General Trading Inc. v. Yale Materials Handling Corp., 119 F.3d 1485, 1501 (11th Cir. 1997), cert. denied, 523 U.S. 1055, 118 S.Ct. 1380, 140 L. Ed. 2d 526 (1998). Some courts have used an "improper use" test, which "finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a 'disproportionate advantage' for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum." In re K.P. Enter., 135 B.R. 174, 179 n. 14 (Bankr. D. Me. 1992); see also In re Better Care, Ltd., 97 B.R. 405, 410-11 (Bankr. N.D. Ill. 1989). Other courts have applied an "improper purpose" test, where bad faith exists if the filing of the petition was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor. See, e.g., In re Camelot, Inc., 25 B.R. 861, 864 (Bankr. E.D. Tenn. 1982). A third line of cases employs an objective test for bad faith based on "what a reasonable person would have believed." Jaffe v. Wavelength,Inc. (In re Wavelength, Inc.), 61 B.R. 614, 620 (9th Cir. BAP 1986) (internal quotation marks omitted). Finally, as the Eleventh Circuit has observed, a number of courts have sought to model the bad faith inquiry on the standards set forth in Bankruptcy Rule 9011. See General Trading Inc., 119 F.3d at 1501-02; In re Fox Island Square Partnership, 106 B.R. 962, 967-68 (Bankr. N.D. Ill.1989). According to the Eleventh Circuit:

> An analysis under Rule 9011 inquires into "a significant objective requirement bearing on the legal justification of a claim or defense: a reasonable inquiry into the facts and the law." In addition to requiring an objective inquiry, Rule 9011 requires a subjective inquiry as well: the bankruptcy proceeding cannot have been interposed for an improper purpose, "such as to harass, to cause delay, or to increase the cost of litigation."

General Trading Inc., 119 F.3d at 1502 (citation omitted).

In re Bayshore Wire Products Corp., 209 F.3d at 105-06.

The Sixth Circuit favors the more general "totality of the circumstances" approach to determine whether bad faith has been demonstrated.  In re John Richards Homes Bldg. Co., L.L.C., 439 F.3d at 254-55.  This methodology examines all relevant factors, including the factors noted by the Second Circuit to the extent applicable:

> In looking at the totality of the circumstances, there are various definitions of bad faith that a court might consider:
>
>> (1) an "improper use" test under which bad faith is found based on creditor attempts to obtain disproportionate advantage by means of an involuntary filing; (2) an "improper purpose" test under which bad faith is found when an involuntary filing is made based on ill-will, malice, or a desire to embarrass or harass the alleged debtor; and (3) a bad faith inquiry based on the standards set forth in Bankruptcy Rule 9011.

Id., 439 F.3d at 255 n.2.

A bankruptcy commentator suggested additional specific factors that a court may consider to determine bad faith under section 303(i)(2):

> The elements constituting bad faith vary from case to case. Courts have found bad faith: (1) when a petitioner acted in disregard of competent legal advice; (2) when a creditor concealed its debts, or alleged a debt which was known to be false; (3) when a creditor failed to investigate grounds for the filing of an involuntary petition prior to filing including the existence of debt against debtor; (4) when a creditor filed a petition simply to forestall foreclosure; and (5) when an insufficient petition was filed without legal justification.

2 Norton Bankruptcy Law & Practice 3d, § 22:16 (2008) (footnotes omitted).

I am also aware that a district court judge, in discussing issues of permissive joinder under section 303(b), defined bad faith in that circumstance:

> Bad faith has been defined as The [sic] opposite of "good faith," generally implying or involving actual or constructive

12

> fraud, or a design to mislead or deceive another, or a neglect
> or refusal to fulfill some duty or some contractual obligation,
> not prompted by an honest mistake as to one's rights or
> duties, but by some interested or sinister motive. [The] [t]erm
> "bad faith" is not simply bad judgment but rather it implies
> the conscious doing of a wrong because of dishonest purpose
> or moral obliquity; it is different from the negative idea of
> negligence in that it contemplates a state of mind
> affirmatively operating with design or ill will.

In re Claren, Inc., 1992 WL 346779, at *1-*2 (E.D. Pa. 1992) (citing In re Elsinore Shore

Associates, 91 B.R. 238 (Bankr. D.N.J. 1988)).

        While I agree that many of the specific factors mentioned above are

relevant to the inquiry, I note that in the context of determining whether a voluntary

bankruptcy petition has been filed in good faith, the Third Circuit Court of Appeals has

instructed that bankruptcy courts should use the broad totality of the circumstances

approach.  See In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2003); In re

Lilley, 91 F.3d 491, 496 (3d Cir. 1996) ("[T]he good faith of Chapter 13 filings must be

assessed on a case-by-case basis in light of the totality of the circumstances.").  Thus, it is

likely that the Third Circuit would conclude that a similar approach to the issue of bad

faith under section 303(i)(2) should apply.  See also In re John Richards Homes Bldg.

Co., L.L.C., 439 F.3d at 254-55.

        Insofar as an award of fees and costs under section 303(i)(1) is concerned,

the statute requires that "1) the court must have dismissed the petition on some ground

other than consent by the parties; and 2) the debtor must not have waived its right to

recovery under the statute."  Higgins v. Vortex Fishing Systems, Inc., 379 F.3d at  705.

Both of those preconditions have been established in this dispute.

Nonetheless, as noted earlier, the award of attorney's fees and costs remains discretionary.  In exercising that discretion, there is consensus that a bankruptcy court should also consider the totality of the circumstances.  See, e.g., id., at 706.  There is a difference of opinion, however, regarding the evidentiary burdens in determining whether an award of counsel fees is appropriate.

In their memoranda, both parties refer to Lacayo, Note: After the Dismissal of an Involuntary Bankruptcy Petition: Attorney's Fees Award to Alleged Debtors, 27 Cardozo L. Rev. 1949 (2006), which article canvassed reported decisions under section 303(i)(1) and concluded that courts had applied four methods for determining whether attorney's fees were justified under section 303(i)(1)(B): "1) the automatic award, 2) the burden shift, 3) the rebuttable presumption, and 4) straight discretion."  Id., at 1959.

Many years ago in In re Ross, 135 B.R. 230 (Bankr. E.D. Pa. 1991), I adopted what is now called the "burden shift approach."  Id., at 238.  That is, I placed the burden of persuasion upon the petitioning creditor(s) to demonstrate that no attorney's fees should be awarded where the involuntary petition had been dismissed and the putative debtor had not waived her fees.  Id.; see, e.g., Higgins v. Vortex Fishing Systems, Inc., 379 F.3d at 707 ("'[A]ny petitioning creditor in an involuntary case . . . should expect to pay the debtor's attorney's fees and costs if the petition is dismissed.'") (quoting In re Kidwell, 158 B.R. 203, 217 (Bankr. E.D. Cal. 1993)).

Years later, a thoughtful decision in In re Scrap Metal Buyers of Tampa, Inc., 233 B.R. 162 (Bankr. M.D. Fla. 1999), aff'd, 253 B.R. 103 (M.D. Fla. 2000), applied a slightly different approach:

> When an involuntary petition is dismissed, whether with a bad
> faith finding or not, this Court finds an involuntary debtor's

> motion for attorneys' fees and costs under § 303(i)(1) raises a
> rebuttable presumption that fees and costs are authorized.
> The involuntary debtor bears the burden to show the fees
> requested are reasonable.  It is then the petitioning creditors'
> burden to establish, under the totality of the circumstances,
> that factors exist which overcome the presumption, and
> support the disallowance of fees.

Id., at 166.

Apparently the difference in the two approaches is the perception that the shifting-burden methodology not only requires the unsuccessful petitioning creditor to present evidence that any award of discretionary fees is unwarranted, but that it also obligates the petitioning creditor to demonstrate that the amount of the fees sought by the putative debtor are unreasonable.  See Lacayo, Note: After the Dismissal of an Involuntary Bankruptcy Petition: Attorney's Fees Award to Alleged Debtors, 27 Cardozo L. Rev. at 1965 ("Unlike the burden shift approach—where the debtor must show only that the involuntary petition has been dismissed before the burden shifts—under the rebuttable presumption approach, the burden of proof remains on the debtor to show that the attorney's fees requested are reasonable.").

To the extent that Ross is viewed as shifting the evidentiary burden to petitioning creditors to demonstrate the unreasonableness of the amount of attorneys fees sought, that was not my intention.  See In re Ross, 135 B.R. at 237 (noting a distinction between "the amount of fees awarded" and the "allowance of fees under section 303(i)(1)").  Similar to a discretionary fee-shifting statute such as 42 U.S.C. § 1988(b), a putative debtor is ordinarily entitled to have an award of counsel fees if the conditions of section 303(i) apply.  See, e.g., In re Macke International Trade, Inc., 370 B.R. 236, 249, 250 (B.A.P. 9th Cir. 2007) (an award of counsel fees under section 303(i) is routine); see

15

also <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 429 (1983) (successful plaintiffs will generally be awarded counsel fees under section 1988).  The burden falls upon the petitioning creditor(s) to justify that an award of fees is inappropriate.  However, if attorney's fees are allowed, the evidentiary burden to establish the reasonableness of the amount awarded rests upon the putative debtor.  <u>See</u> <u>also</u> <u>Hensley</u>, 461 U.S. at 433-34, 438.

III.

A finding of bad faith under section 303(i)(2) is germane, not only to the issue of damages, but also to an award of counsel fees under section 303(i)(1).  <u>See</u>, <u>e.g.</u>, <u>In re Reid</u>, 854 F.2d at 160 ("[W]e believe that the presence or absence of bad faith will inform the exercise of the district court's discretion under § 303(i)."); <u>In re Ross</u>, 135 B.R. at 237 (a finding of bad faith has "historically resulted in an award of fees against the petitioner.").  Therefore, I consider that issue first.

To support her burden that the Liquidator filed the involuntary petition against her in bad faith, Mrs. Diloreto maintains that he performed no reasonable investigation to determine that she had twelve or more creditors—thus necessitating three petitioning creditors under section 303(b).  Nor, she argues, did he investigate whether she was paying her debts as they became due under section 303(h).  Furthermore, she contends that the involuntary petition was filed solely to prevent the state court from rendering an adverse ruling striking the Liquidator's writ of execution against Pepper and was undertaken simply to benefit the Liquidator, not any other creditors.  She emphasizes that once the malpractice litigation settled and the settlement funds were escrowed, the

16

Liquidator never attempted to properly serve the involuntary petition after it had been dismissed in January 2008.

The Liquidator counters that his petition was filed in good faith. He points to evidence that before the involuntary petition was filed he, through his agents, performed a judgment and lien search, ex. PC-6, obtained a LEXIS Smartlinx report, ex. PC-7, had a copy of Mrs. Diloreto's mortgage application from 2001, ex. PC-2, and had copies of her bank records from 2002. These documents did not reveal her obligation to 12 or more creditors. He also emphasizes that Mrs. Diloreto admitted in her earlier section 305(a) motion (quoted above) that she had fewer than twelve creditors.

Moreover, the Liquidator argues that Mrs. Diloreto was found by a state court jury to be involved in the improper diversion of assets to offshore entities and thus exhibited a prior history of secreting assets, thereby placing at risk any settlement proceeds she might receive.[10] Furthermore, she was not paying the Liquidator's judgment and was not paying her promissory note debt to the Pepper firm. He firmly believes that she acted in 2001 to convert equity in her Pennsylvania realty into exempt Florida realty in response to the jury verdict against her. Thus, the Liquidator opines that he had a reasonable belief that Mrs. Diloreto would attempt to place significant assets, such as the proceeds of the malpractice litigation, outside the reach of creditors, thereby justifying the

---

[10]The Liquidator highlights exhibit PC-1, which as an email message from Mrs. Diloreto's malpractice litigation counsel to Pepper's trial counsel dated September 14, 2007, discussing potential settlement terms. Included among those terms is a proposal to Pepper that Pepper pay settlement funds directly to counsel for Mrs. Diloreto. The Liquidator argues that this message reflects an attempt to prevent assets from being transferred to Mrs. Diloreto and thus not subject to execution. Mrs. Diloreto offers a different construction. See Diloreto Reply Memorandum, at 3-4. For purposes of section 303(i)(2) I find this message of limited significance, since the Liquidator did not learn of it until long after he filed the involuntary petition.

17

need for bankruptcy trustee control.  Moreover, had the involuntary petition been properly served and adjudicated, the Liquidator contends that he would have prevailed under section 303(b) and (h) and an order for relief entered.

Mrs. Diloreto replies that the Liquidator improperly considered documents many years old and should have sought more timely financial information from the debtor or her malpractice counsel prior to concluding that only one petitioning creditor was needed under section 303(b).  Moreover, she maintains that there was no obligation presently due and owing to Pepper (the promissory note had not yet matured) and the only obligation she was not paying as it came due was the Liquidator's judgment—a debt she dismisses as unconstitutional and the product of attorney malpractice.  Diloreto Reply Memorandum at 6, n.4.  Therefore, she asserts that the Liquidator had no basis for concluding that the standards of either sections 303(b) or 303(h) could be established.

In reviewing the totality of circumstances, I cannot conclude that Mrs. Diloreto has overcome the presumption that the Liquidator's involuntary petition was not filed in bad faith, for purposes of section 303(i)(2).  Unlike, for example, Landon v. Hunt, 977 F2d 829 (3d Cir. 1992), where the involuntary petition was filed by petitioners who knew that they did not hold valid claims against the putative debtor, the Liquidator holds a $20 million judgment claim against Mrs. Diloreto, which judgment was upheld on appeal.  Furthermore, he believed that Mrs. Diloreto was planning to place litigation proceeds out of the reach of her creditors, which suspicion—in light of certain prior actions—was a sincere belief on his part and not the product of malice.  See generally In re Iowa Coal Mining Company, Inc., 242 B.R. 661, 673 (Bankr. S.D. Iowa 1999).

18

In addition, for purposes of the bad faith analysis, whether Mrs. Diloreto

had 12 or more creditors under section 303(b), and whether the Liquidator acted in willful

disregard of that factual issue, are debatable.  He undertook some investigation of the

issue.  Furthermore, aside from her debts to the Liquidator, Pepper and certain

mortgagees, Mrs. Diloreto's other obligations were to credit card companies, utility

companies, lawn-care and pest-care companies, and a homeowners' association.  These

debts (some in the name of her husband only) were relatively small, recurring obligations,

for which she was current in her payments.  Although the majority of courts and

commentators would consider such obligations as falling within the scope of section

303(b), see, e.g., 2 Norton Bankr. L. & Prac. 3d § 22:5 (2008) ("Under the Code, courts

generally agree that even small and recurring claims should be counted"), some courts do

not.  See id., n.14.  As one commentator has observed:

> Courts are divided over whether small, recurring creditors
> should be counted for purposes of section 303(b).  These
> types of claims would include small claims for current
> expenses, such as utility bills rather than medical bills,
> insurance premiums, mortgage payments and loan
> repayments.  Under the Bankruptcy Act, some courts
> determined that such small, recurring creditors were excluded
> from the calculation of creditors for an involuntary petition,
> and, hence, absent a showing of an intent to change
> congressional intent, some courts insist that that policy should
> persist under the Code.  Both criteria must be met for the
> creditors to be excluded from the count: they must be both
> small and recurring; if they are only small (and not recurring),
> they could be counted.  In one case, a court chose not to count
> a creditor owed $2.00, characterizing the claim as de minimis.
> Other courts find that since the Code does not contain any
> language expressly excluding small and recurring creditors
> from the count, they should be included.  Another view is that
> recurring claims should be included but small claims should
> be excluded under the de minimis principle.  The better
> argument is that unless a debtor is manufacturing small,
> recurring claims in contemplation of an involuntary case (to

19

increase the number of required petitioning entities), small, recurring claims should be included in the count. This argument is bolstered by the fact that section 303(b)(2) is very explicit in enumerating excluded creditors, and small, recurring creditors do not appear within that section. The 2005 amendments did not address the issue. Perhaps Congress was content to let the courts, over time, reason through to a consensus. *In any event, at this point, there is case law to support any position a court might want to take on small, or small and recurring claims.*

2 Collier on Bankruptcy, ¶ 303.04[4] (15th ed. rev. 2008) (footnotes omitted) (emphasis added).

Indeed, Mrs. Diloreto's own bankruptcy counsel appears to have initially discounted such small, recurring obligations as claims under section 303(b) when it filed the section 305(a) dismissal motion and asserted that the putative debtor had fewer than 12 creditors.[11] Therefore, while the Liquidator's analysis of Mrs. Diloreto's financial circumstances as of September 2008 could have been more thorough, and his conclusions regarding the application of section 303(b) may have been erroneous, I do not construe his actions on this point in bad faith.

Nor do I find that the Liquidator's belief that Mrs. Diloreto was not paying her debts as they came due was made in bad faith. His attempt to obtain discovery in aid of execution, which may have provided sworn answers to this question (as to certain debts, her husband tendered payments and so Mrs. Diloreto may not have known if the obligations were current), was not successful.

---

[11]While I agree with Mrs. Diloreto that such an assertion—made in a withdrawn pleading filed in a related contested matter—represents an evidentiary admission that may later be contradicted by her, rather than a judicial admission that can not, see generally, Russell, Bankruptcy Evidence Manual, § 801.22 (2007-08), the later withdrawal of the pleading does not render her admission a nullity. See generally Lambert v. Credit Lyonnais (Suisse) S.A., 2001 WL 357316, at *2 (S.D.N.Y. 2001).

I do agree with Mrs. Diloreto that the Liquidator's motivation to file the involuntary petition stemmed from the impending malpractice settlement and his desire to execute upon its proceeds.  She contends further that the involuntary case was simply a two-party dispute involving the execution upon assets, a dispute that the Liquidator improperly attempted to transfer into this forum from the state court where it belonged. This contention is somewhat overstated; with a $20 million judgment claim against the putative debtor, the Liquidator would receive virtually the entire distribution made to general creditors in a chapter 7 case involving Mrs. Diloreto.  Therefore, the Liquidator's involuntary petition would not provide him with a measurable advantage over other unsecured creditors of the debtor.  See generally In re Silverman, 230 B.R. 46, 51 n.2 (Bankr. D.N.J. 1998) ("The improper use test questions whether the petitioning creditor used the involuntary bankruptcy process to obtain an improper advantage over other creditors rather than pursuing collection in the appropriate nonbankruptcy forum.").

Accordingly, the totality of the circumstances surrounding this dispute between parties involved in more than 20 years of litigation persuades me that Mrs. Diloreto is not entitled to relief under section 303(i)(2).  See In re Bayshore Wire Products Corp., 209 F.3d at 106-07; In re Macke International Trade, Inc., 370 B.R. at 256-57; In re Synergistic Technologies, Inc., 2007 WL 2264700, at *7-*8 (Bankr. N.D. Tex. 2007).

Therefore, I need not evaluate the evidence offered by Mrs. Diloreto in support of her request for compensatory damages.

IV.

A.

Conversely, the totality of the circumstances supports the award of
reasonable counsel fees and costs to Mrs. Diloreto under section 303(i)(1).  The
preconditions for such an award are clearly established, and the Liquidator has not
demonstrated that such an award would be unjustified.

As noted above, the petition was dismissed because the Liquidator did not
follow the Federal Rules of Bankruptcy Procedure regarding proper service of process.
On this issue, the procedural rule and interpretative decisions were straight forward.  See,
e.g., In re Reid, 854 F.2d at 160 ("[T]he district court should also consider the merit of a
creditor's position that the petition was properly filed when determining whether a
recovery should be awarded under § 303(i).").

Also mentioned previously, the timing of the involuntary petition, as well as
the absence of proper service after dismissal, support Mrs. Diloreto's contention
regarding the Liquidator's motivation in commencing this case.  He was primarily
concerned with securing the malpractice litigation proceeds and was fearful that his
attempted state court levy would be set aside.  And while that motivation was not in bad
faith, considering all of the circumstances and Mrs. Diloreto's prior actions, it does not
warrant denial of relief under section 303(i)(1).

The Liquidator justifies his actions by asserting that Mrs. Diloreto was
likely to act in ways that were improper and would prevent legitimate creditors from

22

reaching her assets: <u>viz.</u>, the malpractice proceeds.  The Liquidator further posits

implicitly that he either had no remedy in state court to prevent such misconduct, or that

any such remedy was inefficient or incomplete, thus sanctioning his involuntary petition.

Yet he never allowed the involuntary petition to be addressed on its merits, suggesting

that the state court settlement that provided for the escrow of a portion of the settlement

funds was sufficient for his purposes.

It has long been accepted that, once an involuntary petition is filed, it

cannot be withdrawn merely because the putative debtor has in some fashion satisfied the

interests of the petitioning creditor:

> [I]t is generally understood that a creditor may not petition for
> involuntary relief and then defeat the involuntary petition by
> withdrawing after reaching its own repayment agreement with
> the debtor.  Such settlements and withdrawals allow the
> involuntary process to be misused by one creditor for its own
> benefit.

<u>In re Nationwide Sports Distributors, Inc.</u>, 227 B.R. 455, 466 (Bankr. E.D. Pa. 1998)

(citations omitted); <u>see</u> <u>In re Taylor & Associates, L.P.</u>, 191 B.R. 374, 378 (Bankr. E.D.

Tenn. 1996).  Furthermore, while an involuntary petition can be dismissed for want of

prosecution, 11 U.S.C. § 303(j)(3), such a dismissal can expose the petitioning creditor to

liability under section 303(i).  <u>See also</u> <u>In re R. Eric Peterson Constr. Co.</u>, 951 F.2d 1175

(10th Cir. 1991) (dismissal under section 303(j)(1) does not preclude an award under

section 303(i)).

In this dispute, the Liquidator essentially elected not to prosecute his

involuntary petition once the malpractice settlement occurred on terms he found

acceptable.  That inaction, plus the purpose of the involuntary filing, along with

uncertainty about the Liquidator's ability to demonstrate compliance with the provisions

23

of sections 303(b) and (h) had the merits of the petition been reached, as well as his

limited investigation into the current financial affairs of Mrs. Diloreto, persuade me that

relief under section 303(i)(1) is warranted.


B.


Mrs. Diloreto seeks counsel fees for all services provided on her behalf

from the date the involuntary petition was filed, September 17, 2007, through the date of

dismissal, January 11, 2008.  She also seeks fees and costs incurred after the petition was

dismissed as they relate to her attempt to recover under section 303(i).  In support thereof,

Mrs. Diloreto primarily relies upon exhibits 25, 28, 30 and J-1, along with testimony

explaining those exhibits.[12]

Section 303(i)(1) permits an award of reasonable counsel fees.  This

federal fee shifting statute, see In re Macke International Trade, Inc., 370 B.R. at 249, is

subject to the same principles applicable in all cases where Congress has statutorily

authorized fees to a prevailing party.  See John T. ex rel. Paul T. v. Delaware County

Intermediate Unit, 318 F.3d 545, 555 n.4 (3d Cir. 2003) ("Although Hensley and Texas

State Teachers Ass'n interpreted the fee-shifting provision of 42 U.S.C. section 1988,

Hensley noted that its standards were 'generally applicable in all cases in which Congress

has authorized an award of fees to a 'prevailing party.'") (quoting Hensley v. Eckerhart,

---

[12]Mrs. Diloreto concedes that $456.50 of time entries found in exhibit 25 are not
compensable, that only $26,411.50 of the services disclosed in exhibit 28 are related to the
involuntary petition, and that she does not seek recovery of any costs listed on exhibit 28.

461 U.S. 424, 433 n.7 (1983)); <u>see also</u> <u>In re Pierce</u>, 165 B.R. 252, 256 (Bankr. N.D. Ind. 1994).

      First, in awarding counsel fees, a court should apply the "lodestar" method. <u>See</u>, <u>e.g.</u>, <u>In re Macke International Trade, Inc.</u>, 370 B.R. at 254; <u>In re Glannon</u>, 245 B.R. 882, 895 n.21 (D. Kan. 2000). The lodestar method involves the multiplication of a prevailing market hourly rate, given the experience of the professional and the nature of the professional services provided, with the number of hours reasonably expended in providing those services. <u>See</u>, <u>e.g.</u>, <u>In re Busy Beaver Bldg. Centers, Inc.</u>, 19 F.3d 833, 849 n.21 (3d Cir. 1994); <u>see also</u> <u>Pennsylvania Envtl. Defense Foundation v. Canon-McMillan Sch. Dist.</u>, 152 F.3d 228, 231-32 (3d Cir. 1998).

      In order to determine the appropriate hourly rate, a court should award the "market rate" for such services. <u>See</u> <u>In re Busy Beaver Building Centers, Inc.</u>, 19 F.3d at 849. A determination of the relevant market rate includes consideration of the experience of the individual attorney or paraprofessional who provided the services. <u>See</u>, <u>e.g.</u>, <u>In re Cendant Corp. PRIDES Litigation</u>, 243 F.3d 722, 732 n.11 (3d Cir.) <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u>. <u>Kirby McInerney & Squire, LLP v. Joanne A. Aboff Family Trust</u>, 534 U.S. 889 (2001); <u>Lake v. First Nationwide Bank</u>, 900 F. Supp. 726, 735 (E.D. Pa. 1995); <u>In re Paster</u>, 119 B.R. 468, 469 (E.D. Pa. 1990) ("[R]easonable hourly rate is set by the court based upon a number of factors, 'including the difficulty of the task, the prevailing market rate for counsel of petitioner's experience, counsel's normal billing rate, and the rates awarded by other courts in similar circumstances'") (quoting <u>Jungkurth v. Eastern Financial Services Inc.</u>, 87 B.R. 333, 337 (E.D. Pa. 1988)).

In addition, reasonable counsel fees require that compensation not be awarded for overstaffing cases, having senior attorneys perform services that a junior attorney or paralegal could perform, or billing for services that are secretarial and thus part of overhead.  See generally In re Jefsaba, Inc., 172 B.R. 786 (Bankr. E.D. Pa. 1994).  Reasonable time also involves consideration of the nature of the services rendered and so the amount of professional time that was required.  See generally In re Macke International Trade, Inc., 370 B.R. at 244 (deduction made for "overworking" the case).

Another general principle involved in fee-shifting disputes is that compensation should not be awarded for litigating unsuccessful claims.  In the context of applying the permissive fee-shifting provisions of 42 U.S.C. § 1988, the Supreme Court instructed:

> [T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988.  Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee.  Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.  But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

Hensley, 461 U.S. at 440; see, e.g., In re Pierce, 165 B.R. at 256; In re Leach, 102 B.R. 805, 808 (Bankr. D. Kan. 1989).

The parties stipulated to the "attorney's fees and paraprofessional rates allowed in 2006 and 2007 for representation of debtors in Bankruptcy [sic] cases filed in the Eastern District of Pennsylvania."  Ex. J-1.  Included in this stipulation was a

26

spreadsheet showing the name of the attorney or paraprofessional, years of experience, and allowed hourly rate.  Id.   Upon review of this exhibit, I agree with Mrs. Diloreto that the hourly rates sought by her bankruptcy counsel, Weir & Partners, in the instant motion are market rate, given their experience levels.  (The Liquidator does not appear to challenge these rates).

More problematic, however, are the services rendered by counsel.  Mrs. Diloreto seeks compensation for services rendered as to positions asserted that were completely unsuccessful: her motion to recuse; her request for dismissal under section 305(a); her position that without undertaking prepetition credit counseling an individual is ineligible to be an involuntary debtor; her request for damages and punitive damages under section 303(i)(2); and her motion to reopen a case that was never closed under section 350(a).  In addition, to the extent Weir & Partners performed services for the benefit of Mr. Diloreto, whom the law firm also represented, the Liquidator should not be held responsible under section 303(i)(1).

Some of the time entries disclose services that involved both successfully asserted positions—viz., opposing the appointment of a gap trustee; dismissal for lack of proper service; recovery under section 303(i)(1)—and unsuccessful contentions. See exs. 25, 28, and 30.  In those instances, in my discretion partial allowance has been made. Furthermore, Mrs. Diloreto's motion to transfer venue was not frivolous, though it became moot once dismissal for lack of service was granted.  I have allowed reasonable reimbursement for the time spent on that issue as well.

I agree with Mrs. Diloreto that certain services provided by her bankruptcy counsel that would otherwise be reimburseable under section 303(i)(1) were included in

27

her fee request to the state court, which request was granted.  While the Liquidator should

reimburse Mrs. Diloreto for such services,[13] I cannot agree with her that preclusion

principles require that the reimbursement be at a multiplier of two.  While the state court

concluded that, for purposes of achieving a settlement of the malpractice litigation, the

services of Weir & Partners warranted a multiplier, the discretionary issues under section

303(i)(1) are different.  Moreover, the Liquidator was never a party to that state court

litigation.  Cf. Mayer v. Garman, 590 Pa. 268 (2006) (absent proper service, state court

order cannot bind a non-party to litigation).  Thus, no multiplier will be assessed against

the Liquidator under section 303(i)(1).

   The mediation that took place, agreed to by both parties, involved not only

the attempted resolution of the issues posed by the involuntary petition, but also the

claims of the Liquidator against Mr. and Mrs. Diloreto arising from the judgments against

them and the execution efforts made on those judgments.  Some but not all of the time

spent should be recoverable.

   Legal services, including tax advice related to the malpractice settlement

provided by another firm that is included as a requested cost, which would have been

provided independently of the involuntary petition, are not compensable under section

303(i)(1).  See In re Pierce, 165 B.R. at 256.  Also only partial allowance will be given

for services rendered by bankruptcy counsel that analyzed potential avoidable transfers

---

[13]Upon settlement of the malpractice action, a portion of the settlement was paid
to Mrs. Diloreto's state court counsel, a portion was paid to Weir & Partners (her bankruptcy
counsel), and the balance paid into an escrow account.  Weir & Partners acknowledges that any
award under section 303(i)(1) for services already compensated from the state court settlement
would be added to the settlement fund escrow; thus, this law firm would not receive payment
from two sources for the same services.

and exemption issues were the involuntary petition granted. Consideration of those legal issues may be relevant in advising a client as to the possible effects of the entry of an order for relief, but played no role in the dismissal of the involuntary petition.

Finally, in an attempt to end the parties' dispute in this forum, I have included an award for the time spent in litigating the section 303(i) issues, recognizing that some of Mrs. Diloreto's claims therein were unsuccessful.

In making the following discretionary award under section 303(i)(1), I have also taken into consideration the particular legal theory upon which dismissal was granted, as well as the complicated and lengthy disputes involving Mrs. Diloreto and the Liquidator, all of which should be included in the computation of the reasonable number of hours spent in the context of section 303(i)(1).

First, for the time spent in obtaining dismissal of this involuntary case between September 17, 2008 and January 11, 2008, Mrs. Diloreto is entitled to an award of counsel fees of $49,150 (of which $11,450 involved services disclosed on exhibit 28, without a multiplier).

Second, an additional $5,500 will be awarded for services involved in drafting and filing the motion under section 303(i), and preparing for the hearing, including the preparation of exhibits and witnesses.

Third, $8,500 will be awarded for the time spent litigating the section 303(i) dispute, including the post-hearing memoranda.

Finally, upon review, and consistent with the analysis above, including certain partial awards for counsel fees, costs in the amount $6,859.44 are reimburseable under section 303(i)(1)(A).

29

C.

The last issue to be considered concerns the Liquidator's contention that

any award of counsel fees and costs in favor of Mrs. Diloreto under section 303(i)(1)

must be offset by the $20 million judgment claim he holds against her.  Recently, that

issue was considered by the Bankruptcy Appellate Panel for the Ninth Circuit in In re

Macke International Trade, Inc.  The appellate panel held:

> The consensus of courts is that a setoff of this sort is
> impermissible.  2 Collier on Bankruptcy, supra, ¶ 303.15[8],
> at 303-125.  If setoff were allowed, there would be little
> downside to a creditor's resort to an involuntary bankruptcy
> petition against a debtor, even if its conduct did not rise to the
> level of "bad faith."  Therefore, given the remedial purpose
> behind, and wide latitude granted to the bankruptcy court by,
> § 303(i), we conclude that the bankruptcy court did not abuse
> its discretion in denying Wechsler's setoff request.

Id., 370 B.R. at 255-256; see, e.g., In re K.P. Enterprise, 135 B.R. 174, 185-86

(Bankr. D. Me. 1992); contra In re Apache Trading Group, Inc., 229 B.R. 887, 890

(Bankr. S.D. Fla. 1999).

Involuntary petitions, even ones filed in good faith, can have a significant

negative effect upon the interests of a putative debtor, including requiring the putative

debtor to incur significant counsel fees.  Section 303(i) was intended to ameliorate those

negative effects by imposing liability upon the unsuccessful petitioning creditor, and the

allowance of a setoff right would severely weaken that statutory provision.  Therefore, I

agree with the holding of Macke and conclude that the Liquidator's setoff request should

be denied.

30

An appropriate order will be entered.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: June 19, 2008

copies to:

Kenneth E. Aaron, Esquire
Weir & Partners, LLP
1339 Chestnur Street, Suite 500
The Widener Building
Philadelphia, PA 19107

Albert A. Ciardi, III, Esquire
One Commerce Square, Suite 1930
2005 Market Street
Philadelphia, PA 19103

31